IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 14, 2004

## STATE OF TENNESSEE v. RONALD YATES

**Appeal from the Criminal Court for Shelby County**
**Nos. 0108883, 0108884     Chris Craft, Judge**

---

**No. W2003-02251-CCA-R3-CD  - Filed December 8, 2004**

---

The defendant, Ronald Yates, was convicted of first degree premeditated murder and attempted first degree murder.  The trial court imposed consecutive sentences of life and twenty-three years, respectively.  In this appeal, the defendant asserts (1) that the evidence is insufficient to support his convictions; (2) that the trial court erred by refusing to grant a mistrial based upon the state's opening statement; (3) that the trial court erred in the admission of certain of the evidence; (4) that the trial court erred by permitting the introduction of a postmortem photograph of the murder victim; (5) that the trial court erred by ordering his trial counsel to alter the form and manner of his questions; (6) that the trial court erred by denying his request for a mistrial based upon the state's violation of a discovery order; (7) that the trial court erred by denying his motion for judgment of acquittal because the state failed to prove venue; (8) that the trial court erred by refusing to grant a mistrial based upon ineffective assistance of counsel; and (9) that the sentence is excessive.  The 23 year sentence for attempted first degree murder is modified to 20 years; otherwise, the judgments of the trial court are affirmed.

### Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed as Modified

GARY R. WADE, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

William D. Massey and Lorna S. McClusky, Memphis, Tennessee (at trial), and Gerald D. Skahan, Memphis, Tennessee (on appeal), for the appellant, Ronald Yates.

Paul G. Summers, Attorney General & Reporter; Michael Markham, Assistant Attorney General; and Patience Missy Branham and Eric Christensen, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

On January 10, 2001, the defendant entered a residence located at 5086 Bowie Street in Memphis and shot the victims, Michael Monroe, Sr., and Erik Monroe. Michael Monroe, Sr., died as a result of a gunshot wound to the head. His fifteen-year-old nephew, Erik Monroe, was shot once in the left arm and once in the right hand.

Jolene Monroe, her brother, Michael Monroe, Sr., her sons, Erik Monroe and twenty-two-year-old Michael Monroe, Jr., and her nephew, Reginald Williams, lived at 5086 Bowie Street. Shortly after leaving for work at 6:00 a.m. on the day of the offenses, Ms. Monroe received a telephone call from one of her sons, who said she "needed to get home quick." According to Ms. Monroe, her brother was dating Linda Matthews at the time of his death.

Erik Monroe, who was in bed with a cold on the day of the shootings, testified that he opened his bedroom door when he heard someone enter the residence. Erik recalled that he saw the defendant standing in the hallway. When the defendant asked for "Mike," Erik responded, "He's in the bathroom." Erik stated that after he returned to bed, he heard his uncle say, "Linda's not here," followed quickly by "knocking up against the wall," which sounded "like a fight." Erik recalled that when he opened his bedroom door, he saw the two men fighting in a corner. As Erik walked toward them, the defendant pulled a gun from his pocket and shot Michael Monroe, Sr., twice. Erik testified that when he ran into his bedroom, the defendant followed him, shooting him first in the left shoulder and then in his right hand as he blocked a shot aimed at his head.

Erik testified that after the defendant ran away, he went into the kitchen, got a drink of water, and then went into his mother's room to call her cell phone. When he did not get an answer, he called his grandmother and, after washing his hand, picked up the telephone to call the police. As he did so, he heard his brother, Michael Monroe, Jr., talking to the police on another phone. At trial, Erik admitted that while he had failed to identify the defendant on three separate occasions prior to trial, he could positively identify the defendant as his assailant. He recalled telling the police that the perpetrator was tall, heavy set, "brown skinned," and wearing a dark skull cap and a striped shirt.

Michael Monroe, Jr., testified that on the morning of the offenses, he had dressed for work and was in the den when he heard his uncle call his name. He went into the hallway, where he saw his uncle and the defendant fighting. He recalled that his uncle directed him to call the police and, as he did so, he heard two gunshots and then fled from the residence. Michael identified the defendant from a photographic lineup approximately two weeks after the offenses but conceded during cross-examination that he had told police that he did not see the perpetrator's face and could only describe him as male and wearing dark clothing and a hat.

Reginald Williams, Michael Monroe, Sr.'s stepson, testified that on the morning of the shootings, he was getting ready for school when he heard someone enter the residence. When he heard "bumping" at the end of the hall, he went to investigate. Williams recalled that his stepfather, who was "tussling" with the intruder, directed Michael Monroe, Jr. to call the police. He heard two

gunshots as they took a portable telephone outside. Upon hearing the shots, the two younger men ran into the backyard and jumped over the fence. Williams stated that he was unable to identify the intruder because he never saw his face. During cross-examination, however, he conceded that he initially described the assailant as light skinned, less than six feet tall, thin, and in his late twenties.

Charles Broome, who worked with Michael Monroe, Sr., and Linda Matthews at National Guard Products, testified that he had seen the defendant at their workplace four or five times within a week before the offenses. Broome recalled that on one occasion, the defendant had warned Michael Monroe, Sr., that "Linda was his girlfriend and [he] needed to leave her alone."

Linda Matthews, who was pregnant with the defendant's child at the time of the shootings, testified that she and the defendant dated for several months but that she ended the relationship approximately four months before the shootings. She recalled that the defendant was upset about the termination of the relationship and often called her or came by her house unexpectedly. According to Ms. Matthews, she began dating Michael Monroe, Sr., shortly after ending her relationship with the defendant. She confirmed that the defendant had asked her to come back to him so that they could raise their child together.

Kathy Booker, who was dating the defendant, testified that on the morning of the shootings, the defendant arrived at her house sometime between 6:30 and 7:00 a.m. and informed her that his truck had broken down. She stated that the defendant appeared to be "upset" or "excited" and asked her to "hold" him. Later that morning, the defendant told her that he had been accused of shooting two people and suggested that she tell the police that he had been with her all night. Ms. Booker explained that the defendant had stopped by her house on the night before, but had not stayed the night. According to Ms. Booker, she drove the defendant to his house in her car and, later that same evening, her son found a bullet in the car. Ms. Booker testified that she did not own a gun and had never had bullets in her car. She recalled placing the bullet in an envelope and informing the police of its existence but explained that they never came to examine it.

Ms. Booker testified that it was "some weeks" before the defendant surrendered to the police and that they discussed the accusations every day during that time period. During that time, the defendant did not stay at his residence and communicated with her by telephoning her workplace. According to Ms. Booker, the defendant claimed that he had never been to 5086 Bowie and that he did not know anything about the shootings. She acknowledged that she had not given the bullet to the prosecutor until the week before trial. Ms. Booker testified that she feared the defendant, explaining that on the night before the shootings, he showed her a gun and said, "It's a good thing your boyfriend wasn't here. I'd have shot him and thr[own] him over the railing."

Dr. O'Brian Cleary Smith, who performed the autopsy on Michael Monroe, Sr., testified that the cause of his death was an intra oral gunshot wound. He stated that the bullet, a .380 caliber hollow point, traveled through the victim's mouth, fracturing the pallet, and then the base of the skull where it joined the spinal cord. Bone fragments from the skull fracture damaged the brain stem and the cerebellum. He stated that the bullet traveled from front to back and slightly left to right, coming

to rest in the back of the head. It was Dr. Smith's opinion that the gunshot wound would have caused instantaneous incapacitation and that the bullet's trajectory was consistent with the victim's lying face up when he was shot.

During cross-examination, Dr. Smith acknowledged that the bullet trajectory would also have been consistent with the defendant and the victim standing face to face. He stated that the absence of powder burns indicated that the gun was fired from a distance greater than two feet. Dr. Smith testified that the victim suffered only one gunshot wound and that the bullet did not exit the body.

David Hoffman, the defendant's employer, testified that approximately one month after the shootings, the police arrived at his place of employment to take custody of the defendant. He recalled that the defendant was doing paperwork at the time and appeared to be "shocked" and "stunned" when he saw the police. Hoffman remembered that the defendant quietly submitted to the arrest.

I.

Initially, the defendant challenges the sufficiency of the evidence, arguing that the state failed to establish the element of premeditation. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

First degree murder, in this case, is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 2000). Attempt is defined as follows:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.

Tenn. Code Ann. § 39-12-101(a), (b).

Tennessee Code Annotated section 39-13-202 provides that:

[P]remeditation is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (1997). Whether the evidence is sufficient depends entirely on whether the state was able to establish beyond a reasonable doubt the element of premeditation. See State v. Sims, 45 S.W.3d 1, 7 (Tenn. 2001); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

Our supreme court has held that the presence of premeditation is a question for the jury and may be inferred from the manner and circumstances of the killing. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Moreover, it is well-established that premeditation may be proved by circumstantial evidence. See, e.g., State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). Our high court has identified a number of circumstances from which the jury may infer premeditation: (1) the use of a deadly weapon upon an unarmed victim; (2) the particular cruelty of the killing; (3) the defendant's threats or declarations of intent to kill; (4) the defendant's procurement of a weapon; (5) any preparations to conceal the crime undertaken before the crime is committed; (6) destruction or secretion of evidence of the killing; and (7) a defendant's calmness immediately after the killing. See Pike, 978 S.W.2d at 914-15; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). This list, however, is not exhaustive and serves only to demonstrate that premeditation may be established by any evidence from which the jury may infer that the killing was done "after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d); see Pike, 978 S.W.2d at 914-15; Bland, 958 S.W.2d at 660.

One treatise provides that premeditation may be inferred from events that occur before and at the time of the killing:

Three categories of evidence are important for [the] purpose [of inferring premeditation]: (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, planning activity; (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and (3) facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

2 Wayne R. LaFave, Substantive Criminal Law § 14.7(a) (2d ed. 2003) (emphasis in original).

Here, the evidence adduced at trial established that the defendant was upset about Michael Monroe, Sr.'s relationship with his ex-girlfriend, Linda Matthews, and had warned him to stay away from her. On the night before the shootings, the defendant displayed a gun to Ms. Booker, informing her that he would have killed her boyfriend. The next morning, the armed defendant entered the victims' residence surreptitiously, struggled with Michael Monroe, Sr., and then shot him. Erik Monroe testified that the defendant fired his gun twice during the altercation, on the second occasion shooting Michael Monroe, Sr. as he lay on the floor. Dr. Smith testified that Michael Monroe, Sr. suffered a single gunshot wound to the inside of his mouth. It was Dr. Smith's opinion that the trajectory of the bullet was consistent with Michael Monroe, Sr.'s being shot while lying down and that the bullet was fired from a distance greater than two feet. After shooting Michael Monroe, Sr., the defendant followed Erik into his room and shot him twice. The first bullet struck Erik in the left arm and the second was a defensive wound to his right hand. After the shootings, the defendant asked Ms. Booker to lie to the police. He did not return to his residence for almost three weeks before he was arrested. The jury accredited the theory of the state. In our view, the evidence is sufficient to support the defendant's convictions for the first degree premeditated murder of Michael Monroe, Sr. and the attempted first degree murder of Erik Monroe.

II

The defendant next contends that the trial court erred by denying his motion for a mistrial based upon the opening statement of the prosecution. The state submits that the trial court properly denied the request. "The entry of a mistrial is appropriate when the trial cannot continue for some reason, or if the trial does continue, a miscarriage of justice will occur." State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial is within the sound discretion of the trial court, and this court will not disturb the trial court's determination unless a clear abuse of discretion appears on the record. Id.

Here, the defendant contends that the state's assertion during its opening statement that Ms. Matthews ended their relationship because he had become abusive qualified as an inadmissible reference to a prior bad act. Initially, opening statements are not evidence. As our supreme court has observed, opening statements "are intended merely to inform the trial judge and jury, in a general way, of the nature of the case and to outline, generally, the facts each party intends to prove. Such statements do not amount to stipulations and certainly are not a substitute for the pleadings or for

evidence." Harris v. Baptist Mem'l Hospital, 574 S.W.2d 730, 732 (Tenn. 1978). Further, the trial court sustained the defendant's objection to the statement and instructed the jury to disregard the remark. Under our law, the jury is presumed to follow the instructions of the trial court. See State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994). It is our view, therefore, that the trial court did not abuse its discretion by denying the defendant's request for a mistrial.

III

The defendant also asserts that the trial court erred by allowing into evidence two hearsay statements: Jolene Monroe's statement that her son told her she "needed to get home quick" and Kathy Booker's statement, "The lawyer told him not to." The state submits that neither statement qualifies as hearsay.

It is well established that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion. State v. Campbell, 904 S.W.2d 608, 616 (Tenn. 1995); State v. Baker, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989); see also Tenn. R. Evid. 104. The Rules of Evidence provide that "hearsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c).

As to the first remark, the defendant failed to make a contemporaneous objection to Ms. Monroe's statement that her son told her she "needed to get home quick." Generally, appellate relief will not be granted "to a party responsible for an error or who failed to take whatever action was reasonably necessary to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a); see State v. Gregory, 862 S.W.2d 574, 578 (Tenn. Crim. App. 1993). Nevertheless, the testimony does not qualify as hearsay. That Ms. Monroe "needed to get home quick" was not offered to prove the truth of the matter asserted, that she should quickly return to her residence, but was instead offered to explain why she returned to her residence after leaving for work. In consequence, the defendant is not entitled to relief on this issue.

Similarly, Ms. Booker's statement, made in response to a question by defense counsel regarding the defendant's failure to turn himself in to the authorities, that "[t]he lawyer told him not to do it," does not qualify as hearsay. It was not offered to prove the truth of the matter asserted, that the defendant's counsel had, in fact, advised him against surrendering to the police, but was instead offered to prove why the defendant did not report to the police. In consequence, the trial court did not abuse its discretion by admitting the testimony.

IV

The defendant next asserts that the trial court erred by admitting a post-mortem photograph of the victim. The state submits that the photograph about which the defendant complains was never actually admitted into evidence.

The admissibility of photographs is governed by Tennessee Rule of Evidence 403. See State v. Banks, 564 S.W.2d 947 (Tenn. 1978). The evidence must be relevant and its probative value must outweigh any prejudicial effect. Tenn. R. Evid. 403; Banks, 564 S.W.2d at 950-51. Whether to admit the photographs rests within the sound discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion. State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); State v. Allen, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

Initially, the defendant has failed to specify the photograph that he contends should have been excluded. A citation to the transcript included in the defendant's brief indicates that his objection is to a photograph which was marked for identification purposes as exhibit B. That photograph depicts Michael Monroe, Sr.'s blood covered face. At the suggestion of the trial court, the state used a different photograph to indicate where Erik Monroe was standing during the altercation. The photograph marked for identification as exhibit B was never entered into evidence and was not seen by the jury. Thus, the defendant is not entitled to relief.

V

The defendant next contends that the trial court erred by ordering defense counsel to alter the form and manner of his questions during cross-examination. The state argues that the trial court did not abuse its discretionary authority.

The propriety, scope, manner and control of the examination of witnesses is within the sound discretion of the trial court. State v. Humphreys, 70 S.W.3d 752, 766-67 (Tenn. Crim. App. 2001). The ruling of the trial court in this regard will not be overturned absent an abuse of that discretion. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). "An abuse of discretion exists when the reviewing court is firmly convinced that the lower court has made a mistake in that it affirmatively appears that the lower court's decision has no basis in law or in fact and is therefore arbitrary, illogical, or unconscionable." State v. Brown & Williamson Tobacco Corp., 18 S.W.3d 186, 191 (Tenn. 2000). Tennessee Rule of Evidence 611 provides that "[t]he court shall exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel." Tenn. R. Evid. 611(a). The Advisory Commission Comments state that Rule 611(a) "recognizes the inherent power of a court to control trial conduct to prevent lawyers from abusing the process." Id., Advisory Commission Comments.

In this case, the trial court instructed defense counsel to ask questions rather than make statements during the cross-examination of Ms. Booker. The trial court observed that the form of counsel's examination was confusing to the witness, as evidenced by her attempts to answer before defense counsel finished his inquiries. In an attempt to avoid further confusion, the trial court also instructed the witness not to respond until a question had been asked. Sometime later, during a bench conference outside the hearing of the jury, the following colloquy occurred:

> DEFENSE COUNSEL: Your Honor, . . . we're getting into curtailing my cross-examination here. And . . . that's just what I'm feeling and I'm making a record on it.

THE COURT: Mr. Massey, what you're doing, just for the record, you'll say something, you'll make a statement, and then sometimes you'll keep going and ask questions or make other statements. Sometimes you won't. But you make a statement. Sometimes you make the statement to the jury as if it's closing argument without even looking at the witness. Sometimes you'll make a statement to the witness and then open your eyes wide. Open your mouth as if saying with body language like so with three question marks. Or what do you have to say to that with question marks. And frankly the witnesses don't know am I supposed to answer. What's the question? . . . .

. . . .

. . . I'm not trying to restrict this cross examination, but if you're going to object what I'm going to do is this. You're going to have to ask questions in proper form or we're going to have to stop it. You have to ask proper questions.

DEFENSE COUNSEL: Your Honor, the Supreme Court says that you can ask questions in declaratory form also. It's in your voice inflection as to what a question is.

THE COURT: Well, then I'm going to have to start describing your body language then for the record because you'll say something like and you said this to the police and you'll read something and you'll look at the jury and then like lurch forward and open your arms wide with a questioning look and it's like a verbal question mark. And then sometimes you'll continue to talk. Sometimes you'll ask these questions of the jury. . . .

. . . .

. . . It's very confusing to the witness. And so I have -- although I'm not going to restrict your cross examination I have wide discretion in its control. And I'm letting you do this. It's taking a lot of time and sometimes you'll ask a question like there's a period prior to his coming over to her house while they were dating and then there's a period after on that morning where he was at her house and then there's a period after that time. And you'll ask a question we don't know which of the three periods it's referring to. . . . And the questions aren't specific. Now, I understand you have a right to have a certain technique, but this right now is getting very confusing. And the record will be clear on that except it won't show the times that you turned to the jury and make statements. And then without saying another word you turn to the witness with a question mark body language. . . .

In our view, the trial court did not abuse its discretion by directing counsel to use the interrogatory form when posing questions to the witness. The record establishes that the witness was confused by the method and that, as a result, the witness and defense counsel were often talking at the same time. The defendant is not entitled to relief on this issue.

VI

The defendant claims that the trial court erred by admitting into evidence the bullet discovered by Ms. Booker in her car. He asserts that it should not have been allowed because the state failed to establish a proper chain of custody and because the state failed to disclose the existence of the bullet prior to trial. The defendant also contends that the trial court erred by denying his request for a mistrial based upon the state's failure to disclose the bullet as potential evidence prior to trial. The state submits that a proper chain of custody was established and that the trial court did not err by admitting the bullet into evidence.

Initially, the defendant did not object to the chain of custody at trial. A defendant may not assert one ground for relief in the trial court and then pursue a new or different theory on appeal. See State v. Adkisson, 899 S.W.2d 626, 634-35 (Tenn. Crim. App. 1994). From that perspective, the defendant has waived this issue. Further, the defendant is not entitled to relief on the merits of his claim.

As a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody. State v. Goodman, 643 S.W.2d 375, 381 (Tenn. Crim. App. 1982). The purpose of the chain of custody requirement is to "demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence." State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993). While the state is not required to establish facts which exclude every possibility of tampering, the circumstances established must reasonably assure the identity of the evidence and its integrity. State v. Ferguson, 741 S.W.2d 125, 127 (Tenn. Crim. App. 1987). This rule does not require absolute certainty of identification. Ritter v. State, 462 S.W.2d 247, 250 (Tenn. Crim. App. 1970). Absent sufficient proof of the chain of custody, however, the "evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means." Neil P. Cohen et al., Tennessee Law of Evidence § 9.01[13][c] (4th ed. 2000). A leading Tennessee treatise provides as follows:

> The concept of a "chain" of custody recognizes that real evidence may be handled by more than one person between the time it is obtained and the time it is either introduced into evidence or subjected to scientific analysis. Obviously, any of these persons might have the opportunity to tamper with, confuse, misplace, damage, substitute, lose and replace, or otherwise alter the evidence or to observe another doing so. Each person who has custody or control of the evidence during this time is a "link" in the chain of custody. Generally, testimony from each link is needed to verify the authenticity of the evidence and to show that it is what it purports to be. Each link in the chain testifies about when, where, and how possession or control of the evidence was obtained; its condition upon receipt; where the item was kept; how it was safeguarded, if at all; any changes in its condition during possession; and when, where and how it left the witness's possession.

Id. The issue addresses itself to the sound discretion of the trial court; its determination will not be disturbed in the absence of a clearly mistaken exercise of such discretion. State v. Beech, 744

-10-

S.W.2d 585, 587 (Tenn. Crim. App. 1987); State v. Johnson, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984). Reasonable assurance, rather than absolute assurance, is the prerequisite for admission.

Here, Ms. Booker identified the envelope containing the bullet as the same envelope in which she had placed the bullet after her son discovered it in her car. She testified that she retained possession of the bullet until the week prior to trial, when she delivered it either to the District Attorney's Office or to the police. It is our view that this testimony was sufficient to establish "the identity of the evidence and its integrity." See Ferguson, 741 S.W.2d at 127.

The defendant failed to lodge a timely objection that the bullet should not have been admitted on grounds that the state had failed to disclose its existence prior to trial. The record establishes that during the direct examination of Ms. Booker, the state introduced the bullet as exhibit 37. The defendant did not object to the admission of the bullet into evidence and, in fact, asked Ms. Booker several questions about the bullet. During re-direct examination by the state, the defendant moved for a mistrial based upon Ms. Booker's testimony that the defendant had threatened to kill her boyfriend. The trial court conducted a hearing on the motion outside the presence of the jury, during which the defendant also objected to the admission of the bullet. By the time of the defendant's objection, however, the bullet had already been passed to the jury. Appellate relief will not be afforded "to a party responsible for an error or who failed to take whatever action was reasonably necessary to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a); see Gregory, 862 S.W.2d at 578. Because the defendant failed to lodge a timely objection, waiver applies. Moreover, the defendant would not be entitled to relief even if the issue had been properly preserved.

Tennessee Rule of Criminal Procedure 16 provides, in pertinent part, as follows:
> Documents and tangible objects. Upon request of the defendant, the State shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are with the possession, custody or control of the State, and which are material to the preparation of the defendant's defense or are intended for use by the State as evidence in chief at the trial, or were obtained from or belong to the defendant.

Tenn. R. Crim. P. 16(a)(1)(C) (emphasis added). The rule also provides for a continuing duty to disclose such evidence:
> If, prior to or during trial, a party discovers additional evidence or material previously requested or ordered, which is subject to discovery or inspection under this rule, the party shall promptly notify the other party or the other party's attorney or the court of the existence of the additional evidence or material.

Tenn. R. Crim. P. 16(c). Here, the state concedes that it violated the requirements of Rule 16 by failing to inform the defendant of the existence of the bullet and thus precluding him from any independent inspection prior to trial. The state asserts, however, that its error did not affect the results of the trial. See Tenn. R. App. P. 36.

When a party fails to comply with a discovery request, "the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." Tenn. R. Crim. P. 16(d)(2). Whether a defendant has been prejudiced by the state's failure to disclose information is a significant factor in determining an appropriate remedy. State v. Smith, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995). The relevant inquiry is what prejudice has resulted from the discovery violation, not simply the prejudicial effect the evidence, otherwise admissible, had on the issue of a defendant's guilt. State v. Ronald Mitchell, No. 02C01-9702-CC-00070 (Tenn. Crim. App. at Jackson, Sept. 15, 1997) (citing State v. Cottrell, 868 S.W.2d 673, 677 (Tenn. Crim. App. 1992); State v. Garland, 617 S.W.2d 176, 185-86 (Tenn. Crim. App. 1981)). "This court will not presume prejudice from a mere allegation." State v. Quincy L. Henderson, No. 02C01-9706-CR-00227 (Tenn. Crim. App., at Jackson, May 12, 1998). Exclusion of evidence is a "drastic remedy and should not be implemented unless there is no other reasonable alternative." Smith, 926 S.W.2d at 270.

In this case, the defendant has failed to establish that he was prejudiced by the discovery violation. The record establishes that the state showed the bullet to defense counsel before admitting it into evidence. Ms. Booker testified that her son discovered the bullet in her car shortly after the defendant had been inside. While the bullet was admitted ostensibly to establish that the defendant possessed ammunition on the day of the offenses, there was no testimony that this particular bullet was of the same type used to shoot each of the victims. More importantly, both Erik Monroe and Michael Monroe, Jr., identified the defendant as the perpetrator. See State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993) (holding that the testimony of a victim identifying the defendant as the perpetrator is sufficient to support a conviction). The defendant had a motive for the crime, asked Ms. Booker to lie about his whereabouts at the time of the shootings, and failed to return to his residence for several weeks thereafter. Under these circumstances, it is our view that the defendant was not prejudiced by the state's failure to timely disclose the existence of the bullet.

VII

The defendant next contends that the trial court erred by denying his motion for judgment of acquittal. He alleges that the state failed to prove venue.

> Rule 29 of the Tennessee Rules of Criminal Procedure provides, in relevant part, as follows: The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

Tenn. R. Crim. P. 29(a).

This rule empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the state rests or at the conclusion of all the evidence. Overturf v. State, 571 S.W.2d 837 (Tenn. 1978). At the point the motion is made, the trial

court must favor the opponent of the motion with the strongest legitimate view of the evidence, including all reasonable inferences, and discard any countervailing evidence. Hill v. State, 4 Tenn. Crim. App. 325, 470 S.W.2d 853 (1971). When the motion for acquittal is made at the conclusion of the state's evidence and is not granted, the defendant "may offer evidence without having reserved the right." Tenn. R. App. P. 29(a).

Article I, section 9 of the Tennessee Constitution provides that in all criminal prosecutions by indictment or presentment, the accused has a right to a speedy, public trial by an impartial jury of the county in which the crime was committed. Tenn. Const. art. I, § 9; see also Tenn. R. Crim. P. 18. The state must prove that the offense was committed in the county of the indictment. Harvey v. State, 213 Tenn. 608, 612, 376 S.W.2d 497 (1964). Because venue, a question for the jury, is not an element of the offense, it need be established only by a preponderance of the evidence. Hopper v. State, 205 Tenn. 246, 326 S.W.2d 448 (1959); State v. Hamsley, 672 S.W.2d 437, 439 (Tenn. Crim. App. 1984); State v. Baker, 639 S.W.2d 670, 672 (Tenn. Crim. App. 1982). Slight evidence, including circumstantial evidence, will be sufficient if the evidence is uncontradicted. State v. Bennett, 549 S.W.2d 949 (Tenn. 1977). The jury is entitled to draw reasonable inferences from the evidence. State v. Johnson, 673 S.W.2d 877, 882 (Tenn. Crim. App. 1984).

Here, the testimony of Jolene Monroe established that the offenses occurred at her residence at 5086 Bowie Street in Shelby County. Erik Monroe, Michael Monroe, Jr., and Reginald Williams corroborated that testimony. There was no proof to the contrary. In our view, this evidence is sufficient to establish by a preponderance of the evidence that the crime occurred in Shelby County.

VIII

The defendant asserts that the trial court erred by denying his request for a mistrial based upon the ineffective assistance of his trial counsel. He claims that his trial counsel was ineffective by failing to realize that the state had not provided complete discovery, by failing to assume that the state might imply that the previously undisclosed evidence had been provided in discovery, by failing to timely object to the introduction of the bullet discovered by Ms. Booker, and by failing to adequately comprehend the testimony at trial because of a hearing disability. The state contends that the trial court properly denied the motion for a mistrial on this ground.

This court has consistently "warned defendants and their counsel of the dangers of raising the issue of ineffective assistance of trial counsel on direct appeal because of the significant amount of development and fact finding such an issue entails." Kendricks v. State, 13 S.W.3d 401, 405 (Tenn. Crim. App. 1999). Raising the issue of ineffective assistance of counsel on direct appeal is "a practice fraught with peril." State v. Jimmy L. Sluder, No. 1236 (Tenn. Crim. App., at Knoxville, Mar. 14, 1990). The defendant runs the risk of having the issue resolved "without an evidentiary hearing which, if held, might be the only way that harm could be shown--a prerequisite for relief in ineffective trial counsel claims." Jimmy Wayne Wilson v. State, No. 909 (Tenn. Crim. App., at Knoxville, May 29, 1991).

Our supreme court, however, has stated that claims of ineffective assistance of counsel may be presented on direct appeal and that the reviewing court must apply the same standard as utilized for such claims in post-conviction proceedings. See State v. Burns, 6 S.W.3d 453, 461 n.5 (Tenn. 1999). When a defendant seeks relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693 (1984). Should the defendant fail to establish either factor, he is not entitled to relief. Our supreme court described the standard of review as follows:

> Because a [defendant] must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component.

Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

On claims of ineffective assistance of counsel, the defendant is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). The defendant bears the burden of proving his claims by clear and convincing evidence. See Burns, 6 S.W.3d at 461 n.5; State v. William Makransky, No. E2000-00048-CCA-R3-CD (Tenn. Crim. App., at Knoxville, June 28, 2001); see also Tenn. Code Ann. § 40-30-110(f) (2003).

On appeal, the findings of fact made by the trial court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them. Brooks v. State, 756 S.W.2d 288, 289 (Tenn. Crim. App. 1988). The burden is on the defendant to show that the evidence preponderated against those findings. Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978). The credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the trial court. Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990); Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). When reviewing the application of law to those factual findings, however, our review is de novo, and the trial court's conclusions of law are given no presumption of correctness. Fields v. State, 40 S.W.3d 450, 457-58 (Tenn. 2001); see also State v. England, 19 S.W.3d 762, 766 (Tenn. 2000).

In this instance, the defendant complains that his trial counsel was ineffective for a variety of reasons, all of which relate to the bullet discovered by Ms. Booker. He claims that his counsel was unaware that the state had failed to provide the bullet for inspection during discovery, failed to anticipate that the state would try to introduce the bullet as evidence anyway, missed the opportunity

to timely object to the admission of the bullet, and, due to a hearing impairment, did not understand the importance of Ms. Booker's testimony. The defendant does not, however, explain how he was prejudiced by these alleged deficiencies.

As indicated, trial counsel should have lodged a contemporaneous objection to the bullet. Yet it is our view that the evidence would have ultimately been admitted anyway. No prejudice was caused. As to the hearing impairment, the record demonstrates that the defendant was represented by two attorneys at trial, only one of whom complained about an inability to hear. Further, counsel's complaint that he was unable to hear was limited to the testimony of a single witness, Ms. Booker. The record establishes that trial counsel vigorously cross-examined Ms. Booker on the relevant issues. There is no indication that he was unaware of the content of her direct testimony. In our view, the defendant has failed to establish that he was denied the effective assistance of counsel at trial. No mistrial should have been ordered on this ground.

IX

As his final issue, the defendant asserts that the sentence is excessive. He complains that the trial court erred by allowing victim impact testimony at the sentencing hearing and by failing to consider the appropriate mitigating factors. He also contends that the trial court erred by ordering consecutive sentencing. The defendant does not contest the application of the enhancement factors.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

In calculating the sentence for a Class A felony conviction, the presumptive sentence is the midpoint within the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). If there are enhancement factors but no mitigating factors, the trial court shall set the sentence at or above the midpoint. Tenn. Code Ann. § 40-35-210(d). If there are mitigating factors but no enhancement factors, the trial court shall set the sentence at or below the midpoint. Id. A

-15-

sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210(e). The sentence should then be reduced within the range by any weight assigned to the mitigating factors present. Id.

The defendant was sentenced to life imprisonment for his conviction for the first degree murder of Michael Monroe, Sr. See Tenn. Code Ann. § 39-13-208(c). In arriving at a sentence of twenty-three years for the attempted first degree murder of Erik Monroe, the trial court applied two enhancement factors: (10) that the defendant employed a firearm during the commission of the crime and (13) that the defendant willfully inflicted bodily injury upon another person. See Tenn. Code Ann. § 40-35-114(10), (13) (2003). The trial court also determined that while the defendant's steady employment history and lack of a criminal record might qualify as mitigating factors, they would be entitled to very little weight.

The defendant asserts that the trial court erred by admitting victim impact testimony at the sentencing hearing. The state submits that Erik Monroe, as a victim of the crime, had the statutory right to be heard at the sentencing hearing and that the trial court had a duty to consider the testimony.

Tennessee Code Annotated section 40-38-103 provides that "[a]ll victims of crime shall, upon their request, have the right to . . . [w]henever possible, . . . give impact testimony at court sentencing hearings." Tenn. Code Ann. § 40-38-103(a)(2). Such testimony is governed by Tennessee Code Annotated section 40-35-209, which provides that "[a]t the sentencing hearing, the court shall afford the parties the opportunity to be heard and present evidence relevant to the sentencing of the defendant and may afford the victim of the offense or the family of the victim the opportunity to testify relevant to the sentencing of the defendant." Tenn. Code Ann. § 40-35-209(b). Tennessee Code Annotated section 40-35-210 provides that the trial court is required to consider the information provided by the parties on the enhancement and mitigating factors. Tenn. Code Ann. § 40-35-210(b)(5). This court has held that "[w]henever victim impact information contains relevant and reliable evidence relating to enhancing or mitigating factors and/or any other sentencing consideration, the trial court should consider it and determine what weight, if any, should be given to that evidence." State v. Ring, 56 S.W.3d 577, 584 (Tenn. Crim. App. 2001). This court has also concluded that testimony about "the emotional, psychological, or physical effects" of the crime on the victim is relevant as to the nature and circumstances of the crime. State v. Blackhurst, 70 S.W.3d 88, 95 (2001).

Here, both Jolene Monroe and Erik Monroe testified about the impact of the attempt on Erik Monroe's life. Jolene Monroe testified that her son had undergone counseling. There was proof that the entire family lived in fear of the defendant, who had chased the minor victim into his bedroom, shot him twice, and left only when he thought he was dead. In our view, the trial court did not err by admitting this testimony. Both witnesses had the statutory right to be heard at the sentencing hearing. This testimony was relevant to the nature and circumstances of the offense. The defendant is not entitled to relief on this issue.

The defendant also asserts that the trial court erred by failing to consider certain mitigating circumstances. While he does not indicate which specific factors the trial court should have considered, only two were advanced at trial: (1) the defendant's steady employment history and (2) his lack of a criminal record. As indicated, the trial court ruled that under the entirety of the circumstances, these factors were entitled to very little weight. The weight to be assigned to the appropriate enhancement and mitigating factors falls within the sound discretion of the trial court so long as that court complies with the purposes and principles of the 1989 Sentencing Act and its findings are supported by the record. State v. Boggs, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996). It is our view that the trial court did not abuse its discretion by assigning little weight to these factors.

Under these circumstances, the defendant's twenty-three year sentence is appropriate under the terms of the 1989 Sentencing Act. The United States Supreme Court's recent opinion in Blakely v. Washington, 542 U.S. ____, 124 S. Ct. 2531 (2004), however, calls into question the continuing validity of our current sentencing scheme. In that case, the Court, applying the rule in Apprendi v. New Jersey, 566 U.S. 466, 490 (2000), struck down a provision of the Washington sentencing guidelines that permitted a trial judge to impose an "exceptional sentence" upon the finding of certain statutorily enumerated enhancement factors. The Court observed that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Id. at 2537 (emphasis in original). Finally, the Court concluded that "every defendant has a right to insist that the prosecutor prove to a jury [beyond a reasonable doubt] all facts legally essential to the punishment." Id. at 2543 (emphasis in original).

Under the rule established in Blakely, the defendant's prior convictions may be used to enhance the sentences. The record establishes that the defendant has no prior convictions. The enhancement factors applied by the trial court, (10) and (13), are not based upon prior convictions and were not admitted by the defendant. In consequence, the holding in Blakely would preclude their application. Under the rationale of Blakely, which controls, a sentence of twenty years, the presumptive sentence, is warranted.

Finally, the defendant asserts that the trial court erred by ordering consecutive sentencing. Prior to the enactment of the Criminal Sentencing Reform Act of 1989, the limited classifications for the imposition of consecutive sentences were set out in Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976). In that case, our supreme court ruled that aggravating circumstances must be present before placement in any one of the classifications. Later, in State v. Taylor, 739 S.W.2d 227 (Tenn. 1987), our high court established an additional category for those defendants convicted of two or more statutory offenses involving sexual abuse of minors. There were, however, additional words of caution:

> [C]onsecutive sentences should not routinely be imposed . . . and . . . the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved.

<u>Taylor</u>, 739 S.W.2d at 230. The Sentencing Commission Comments adopted the cautionary language. Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments. The 1989 Act is, in essence, the codification of the holdings in <u>Gray</u> and <u>Taylor</u>; consecutive sentences may be imposed in the discretion of the trial court only upon a determination that one or more of the following criteria[1] exist:

> (1) The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood;
> (2) The defendant is an offender whose record of criminal activity is extensive;
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
> (6) The defendant is sentenced for an offense committed while on probation; or
> (7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).

The length of the sentence, when consecutive in nature, must be "justly deserved in relation to the seriousness of the offense," Tenn. Code Ann. § 40-35-102(1), and "no greater than that deserved" under the circumstances, Tenn. Code Ann. § 40-35-103(2); <u>State v. Lane</u>, 3 S.W.3d 456 (Tenn. 1999).

> The trial court ordered consecutive sentences on the following grounds:
> The only factor that I find in . . . 40-35-115 that I think applies . . . is that the defendant is a dangerous offender, who[se] behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high.
> This applies more to Erik Monroe than to his murder case. Because we don't really know how much hesitation there was when Michael Monroe was murdered, but I do know from the proof of Erik, that as soon as this man was killed, and he

---

[1] The first four criteria are found in <u>Gray</u>. A fifth category in <u>Gray</u>, based on a specific number of prior felony convictions, may enhance the sentence range but is no longer a listed criterion. <u>See</u> Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments.

-18-

knew that this 15 year-old . . . . -- boy saw it, he chased him down to . . . . -- to eliminate him. Even to the fact that the boy hid in his bed under the covers, and he went over and shot him twice while he was in his bed. And he exhibited no hesitation in trying to murder this boy. So, I find that factor is true.

Looking at the Woods factors, the Wilkerson factors, State vs. Braden -- Of course I've already found that the defendant's behavior indicated little or no regard for human life. He didn't hesitate about committing crime which the risk to human life was high, or the circumstance surrounding the commission of the offense aggravated. I think they were, in that, he went into this man's home, from the proof in this case, to kill this man because he was exercising his lawful right as a citizen of this country to go out with a girlfriend, who the defendant had [a] turbulent relationship with. He went up into the man's house, into his castle.

Is confinement for an extended period of time necessary to protect society? Well, looking at this 51-year service before he accumulates sentence credits . . . the defense argues, . . . he'll be 101 when he gets out. Well, you can say that, but there's a high likelihood that because of budget constraints, and the fact that I don't think ten years has gone by without the legislature meddling with our statutes, that -- and especially since 1995 when this 100% violent crimes comes in, that our penitentiaries are going to fill, and that this man, in the next 15 or 20 years is going to be released.

. . . .

So for that reason, I find that factually, that confinement for an extended period of time is necessary to protect society. Whether or not he needs this 23 years consecutive to make that an extended period of time is going to be a question.

. . . [T]he aggregate length of the sentences, if consecutive sentencing is ordered, reasonably relates to the offenses for which the defendant stands convicted. And that the extended sentence is necessary to protect the public against future criminal conduct by the defendant. Reasonably related to the severity of the offenses committed.

. . . .

I don't think that [the defendant] is entitled to a free opportunity to kill this young man. And for that reason, I think that because of the particular circumstances of this offense, a consecutive sentence would reasonably relate to the severity of the criminal attempt murder in the first degree. So for that reason, I'm going to order that the sentences be served consecutive.

In Gray, our supreme court ruled that before consecutive sentencing could be imposed upon the dangerous offender, considered the most subjective of the classifications and the most difficult to apply, other conditions must be present: (a) that the crimes involved aggravating circumstances; (b) that consecutive sentences are a necessary means to protect the public from the defendant; and (c) that the term reasonably relates to the severity of the offenses. In State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), our high court reaffirmed those principles, holding that consecutive sentences cannot be required of the dangerous offender "unless the terms reasonably relate[] to the severity of the offenses committed and are necessary in order to protect the public (society) from further

criminal acts by those persons who resort to aggravated criminal conduct."  The <u>Wilkerson</u> decision, which modified somewhat the strict factual guidelines for consecutive sentencing adopted in <u>State v. Woods</u>, 814 S.W.2d 378, 380 (Tenn. Crim. App. 1991), described sentencing as a "human process that neither can nor should be reduced to a set of fixed and mechanical rules."  905 S.W.2d at 938.

Here, the trial court considered the factors in <u>Wilkerson</u> and concluded that consecutive sentencing was necessary to protect the public from the defendant and that the resulting term was reasonably related to the severity of the offenses.  The trial court placed particular emphasis on the violent nature of the offenses and the defendant's lack of hesitation in committing the crimes.  The record confirms that the defendant qualified as a dangerous offender.  In our view, the trial court did not err by ordering consecutive sentences.

The sentence for attempted first degree murder must be modified to twenty years.  Otherwise, the judgments of the trial court are affirmed.

_____
GARY R. WADE, PRESIDING JUDGE